1   **KAPLAN FOX & KILSHEIMER LLP**
    Laurence D. King (SBN 206423)
2   Matthew B. George (SBN 239322)
    Clarissa Olivares (SBN 343455)
3   1999 Harrison Street, Suite 1560
    Oakland, CA 94612
4   Telephone: 415-772-4700
    Facsimile: 415-772-4707
5   Email:  *lking@kaplanfox.com*
              *mgeorge@kaplanfox.com*
6              *colivares@kaplanfox.com*

7   *Attorneys for Plaintiff Christopher Miller and the*
    *Proposed Class*

8

9              **UNITED STATES DISTRICT COURT**
               **NORTHERN DISTRICT OF CALIFORNIA**
10

11  CHRISTOPHER MILLER, individually, and          Case No. 5:25-cv-03854
    on behalf of all others similarly situated,
12                                                  **Class Action**
                        Plaintiff,
13                                                  **CLASS ACTION COMPLAINT**
              v.
14                                                  **DEMAND FOR JURY TRIAL**
15  CREDIT SESAME, INC.,

16                      Defendant.

17

18

19

20

21

22

23

24

25

26

27

28

Plaintiff Christopher Miller ("Plaintiff"), through his undersigned attorneys, brings this Class Action Complaint against Defendant Credit Sesame, Inc. ("Credit Sesame" or "Defendant"), individually and on behalf of all others similarly situated. Plaintiff makes the following allegations based upon knowledge as to his own respective acts, and upon information and belief, as well as upon his attorneys' investigation, and alleges as follows:

**INTRODUCTION**

1.      Plaintiff brings this class action against Defendant for their failure to implement and maintain reasonable security measures over personal information ("PI") entrusted to it—including, *inter alia*, Plaintiff's and Class Members' financial data, Social Security number ("SSN"), name, date of birth, and address.

2.      Credit Sesame, a financial and online banking service provider in California, presents itself as a service that empowers consumers to monitor and build their credit. According to TransUnion, Credit Sesame has been used by over 18 million consumers seeking to "improve their credit scores, enhance approval odds, and reduce credit costs."[1]

3.      Unfortunately, Credit Sesame has instead damaged Plaintiff's and Class Members' financial wellness and likelihood of building good credit by failing to protect their sensitive data, including financial data and SSNs.

4.      Credit Sesame failed to take reasonable and adequate measures to secure the PI of Plaintiff and similarly situated individuals (the Class Members, as defined below), in the course of designing, building, and maintaining the Credit Sesame application and website, and of collecting, transmitting, and storing Plaintiff's and Class Members' PI.

5.      Credit Sesame appears to have informed the state government of Vermont on or around April 14, 2025, that it had experienced a data breach impacting consumer data (the "Data Breach"). As required by Vermont law, Credit Sesame published a sample notice letter to consumers ("Sample Notice"). The Sample Notice states:

---

[1] https://newsroom.transunion.com/transunion-collaborates-with-credit-sesame-to-launch-new-freemium-direct-to-consumer-credit-education-and-monitoring-offering/#:~:text=About%20Credit%20Sesame&text=With%20a%20decade%20of%20credit,odds%2C%20and%20reduce%20credit%20costs, *last accessed* May 1, 2025.

> Credit Sesame recently identified suspicious online activity related to your account. Upon becoming aware of this activity, we immediately took steps to secure the account and launched an investigation to determine the nature and scope of the activity. The investigation determined there may have been suspicious log-in activity for a limited period of time . . . , which may have resulted in certain user account information being visible to the unauthorized actor . . . . [W]e are notifying you because we determined that certain information related to you was present during the window of unauthorized access, and therefore was potentially impacted, such that we are making you aware of this event in an abundance of caution.[2]

6.      Although the state of Vermont requires notices informing consumers of data breaches to include what data was accessed or exfiltrated, the Sample Notice contains a placeholder in lieu of any description of the impacted data.

7.      Indeed, Credit Sesame has not communicated to consumers any additional information about the cybercriminals who breached consumers' data, which data was impacted, whether the data was exfiltrated or merely accessed, or any other relevant information consumers need in order to protect their data and financial well-being.

8.      Plaintiff is a Credit Sesame user who entrusted his PI, including, *inter alia*, financial information and his SSN, to Credit Sesame based upon its promise to help monitor and improve his credit, not potentially worsen his credit by permitting cybercriminals to access his most sensitive data.

9.      Plaintiff entrusted Credit Sesame with his PI due in part to advertisements and statements made by Credit Sesame. For example, Credit Sesame used to advertise: "Your data is always secure[.]" Since the Data Breach, Credit Sesame has removed this language from its website.

10.     Because of Credit Sesame's failure to exercise due care, unknown cybercriminals were able to access users' PI, including financial data and SSNs. As a result, Plaintiff and the Class Members have been injured through the loss of control of their PI, the need to spend time to take

---

[2] https://ago.vermont.gov/sites/ago/files/documents/2025-04-14%20Credit%20Sesame%20Data%20Breach%20Notice%20to%20Consumers.pdf (Sample Notice"), *last accessed* May 1, 2025.

appropriate steps to mitigate their injury, and the heightened and imminent risk of identity theft or fraud.

## PARTIES

11.     Plaintiff Christopher Miller is a resident of Long Beach, California.

12.     Plaintiff has used Credit Sesame to monitor and build his credit since approximately 2020.

13.     Defendant Credit Sesame, Inc. ("Credit Sesame" or "Defendant") is a California corporation with its principal place of business in Mountain View, California.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332, as amended by the Class Action Fairness Act of 2005, because the matter in controversy exceeds $5,000,000, exclusive of interest and costs, and is a class action in which some members of the Class are citizens of different states than Credit Sesame.  *See* 28 U.S.C. § 1332(d)(2)(A).  This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C.§ 1367.   This Court has personal jurisdiction over Credit Sesame because it is headquartered in California, authorized to do business and conducts business in California, has specifically marketed and sold its products services in California, and has sufficient minimum contacts with this state and/or sufficiently avails itself of the markets of this state to render the exercise of jurisdiction by this Court permissible.

15.     Venue in this Court is proper pursuant to 28 U.S.C. § 1391 because Defendant does substantial business in this District, has intentionally availed itself of the laws and markets within this District through its promotion, marketing, distribution and sales activities in this District, and a significant portion of the facts and circumstances giving rise to Plaintiff's Complaint occurred in or emanated from this District.

## FACTUAL ALLEGATIONS

### A.     The Value of PI

16.     It is well known that PI, and financial account information in particular, is an invaluable commodity and a frequent target of hackers.

17.    For example, in 2024 alone, the Federal Trade Commission ("FTC") received 1.1. million identity theft and 2.6 million fraud claims.[3]  The FTC calculated the total financial loss due to this fraud at $12.5 billion in 2024—a 25% increase from 2023.[4]

18.    Unsurprisingly, polling has demonstrated that over 90% of Americans worry about their PI being exposed in a corporate data breach, and over 85% of Americans feel "frustrated and alarmed" by the frequency of such data breaches.[5]

19.    Consumers are placing the blame where it belongs: on the companies that are collecting and exposing their PI, with nearly 73% of consumers saying that companies should be doing more to protect their data, and nearly 74% of consumers saying that they lose trust in a company—like Credit Sesame—that experiences a data breach.[6]

20.    Consumers are particularly concerned with protecting the privacy of their financial account information and social security numbers, which are the "secret sauce" that is "as good as your DNA to hackers."[7] There are long-term consequences to data breach victims whose social security numbers are taken and used by hackers. Even if they know their social security numbers have been accessed, Plaintiff and Class Members cannot obtain new numbers unless they become a victim of social security number misuse. Even then, the Social Security Administration has warned that "a new number probably won't solve all [] problems … and won't guarantee … a fresh start."[8]

**B.    Credit Sesame's Data Collection**

21.    To access Credit Sesame's services, Plaintiff and Class Members were required to provide sensitive and confidential information to Credit Sesame, as described herein. At the time

---

[3] https://www.ftc.gov/news-events/news/press-releases/2025/03/new-ftc-data-show-big-jump-reported-losses-fraud-125-billion-2024, *last accessed* May 1, 2025.

[4] *Id.*

[5] https://www.carriermanagement.com/news/2025/03/06/272644.htm, *last accessed* May 1, 2025.

[6] *Id.*

[7] https://www.kiplinger.com/article/credit/t048-c011-s001-how-to-protect-your-kids-from-the-anthem-data-brea.html, *last accessed* May 1, 2025.

[8] https://www.ssa.gov/pubs/EN-05-10064.pdf at pp. 6-7, *last accessed* May 1, 2025.

of the Data Breach, the information held by Credit Sesame included the PI of Plaintiff and Class Members.

22.    In the course of providing its services to consumers, Credit Sesame made promises and representations to customers that PI it collected would be kept safe and confidential, and the privacy of that PI would be maintained.

23.    Per the terms of its privacy policy, Credit Sesame collects from consumers a wealth of sensitive PI, including name, SSN, passport identification number, medical card number, credit card information and other banking information, contact information, gender, household information, employer information, and income.[9] It is difficult to imagine a more sensitive collection of data.

24.    In this same policy, Credit Sesame assures consumers that "[t]he security of your personal information is important to us" and describes its encryption of sensitive PI, such as credit card number, at the moment of transmission. However, Credit Sesame does not provide any insight into how data is stored and secured after transmission.

25.    From the first moment they sign up for Credit Sesame, consumers are asked to provide highly-sensitive data, including the last four digits of their SSNs.

26.    Perhaps for this reason, Credit Sesame touts its data security and places consumer comments regarding data safety and security literally front and center on its webpage.[10]

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

---

[9] https://www.creditsesame.com/legal/privacy-policy/, *last accessed* May 1, 2025.

[10] https://www.creditsesame.com/, *last accessed* May 1, 2025

1
2
3
4
5
6
7
8
9
10
11
12



13    27.    Credit Sesame touts its "[s]ecurity you can trust" and assures consumers that it treats

14 consumer data "as if it were our own."[11]

15
16
17
18
19
20
21
22

23 / / /

24 / / /

25 / / /

26 / / /

27 / / /

28 _____

[11] *Id.*

28. On or around May 1, 2025, Credit Sesame removed from its website its previous claim to consumers that "Your data is always secure[.]"



29. In collecting and maintaining consumers' PI, Credit Sesame agreed to safeguard PI provided by consumers, including Plaintiff, in accordance with its internal policies, state law, and federal law.

**C.    Industry Standards for Data Security**

30. In light of the numerous high-profile data breaches targeting companies like Target, Neiman Marcus, eBay, Anthem, and Equifax, Defendant is, or reasonably should have been, aware of the importance of safeguarding PI, as well as of the foreseeable consequences of its systems being breached.

31. Security standards commonly accepted among businesses that store PI using the internet include, without limitation:

       a.      Maintaining a secure firewall configuration;

       b.      Monitoring for suspicious or irregular traffic to servers;

       c.      Monitoring for suspicious credentials used to access servers;

       d.      Monitoring for suspicious or irregular activity by known users;

e.      Monitoring for suspicious or unknown users;

f.      Monitoring for suspicious or irregular server requests;

g.      Monitoring for server requests for PI;

h.      Monitoring for server requests from VPNs; and

i.      Monitoring for server requests from Tor exit nodes.

32.    The U.S. Federal Trade Commission ("FTC") publishes guides for businesses for cybersecurity[12] and protection of PI[13] which includes basic security standards applicable to all types of businesses.

33.    The FTC recommends that businesses:

a.      Identify all connections to the computers where you store sensitive information.

b.      Assess the vulnerability of each connection to commonly known or reasonably foreseeable attacks.

c.      Do not store sensitive consumer data on any computer with an internet connection unless it is essential for conducting their business.

d.      Scan computers on their network to identify and profile the operating system and open network services. If services are not needed, they should be disabled to prevent hacks or other potential security problems. For example, if email service or an internet connection is not necessary on a certain computer, a business should consider closing the ports to those services on that computer to prevent unauthorized access to that machine.

e.      Pay particular attention to the security of their web applications—the software used to give information to visitors to their websites and to retrieve information from them. Web applications may be particularly vulnerable to a variety of hack attacks

---

[12] https://www.ftc.gov/system/files/ftc_gov/pdf/920a_start_with_security_en_aug2023_508_final
_0.pdf, *last accessed* May 1, 2025.

[13] https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business, *last accessed* May 1, 2025.

f.    Use a firewall to protect their computers from hacker attacks while it is connected to a network, especially the internet.

g.    Determine whether a border firewall should be installed where the business's network connects to the internet. A border firewall separates the network from the internet and may prevent an attacker from gaining access to a computer on the network where sensitive information is stored. Set access controls—settings that determine which devices and traffic get through the firewall—to allow only trusted devices with a legitimate business need to access the network. Since the protection a firewall provides is only as effective as its access controls, they should be reviewed periodically.

h.    Monitor incoming traffic for signs that someone is trying to hack in. Keep an eye out for activity from new users, multiple log-in attempts from unknown users or computers, and higher-than-average traffic at unusual times of the day.

i.    Monitor outgoing traffic for signs of a data breach. Watch for unexpectedly large amounts of data being transmitted from their system to an unknown user. If large amounts of information are being transmitted from a business' network, the transmission should be investigated to make sure it is authorized.

34.    The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer information, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.[14]

---

[14] https://www.ftc.gov/news-events/media-resources/protecting-consumer-privacy/privacy-security-enforcement, *last accessed* May 1, 2025/

35.     Because Credit Sesame was entrusted with consumers' PI, it had, and has, a duty to consumers to keep their PI secure.

36.     Consumers, such as Plaintiff and the Class, reasonably expect that when they provide PI to a company, the company will safeguard their PI.

37.     Nonetheless, Defendant failed to upgrade and maintain its data security systems in a meaningful way so as to prevent the Data Breach. Had Defendant properly maintained its systems and adequately protected them, it could have prevented the Data Breach.

38.     Despite lacking appropriate safeguards to consumers' PI, Credit Sesame nonetheless collected sensitive PI from approximately 18 million consumers, including Plaintiff.

**D.     The Data Breach**

39.     On or around April 14, 2024, Credit Sesame notified state officials in Vermont of the Data Breach, presumably pursuant to Vermont's Data Breach Notification Statute, 9 V.S. § 2435, *et seq.*, which requires companies like Credit Sesame to notify the Vermont Attorney General and Department of Financial Regulation within 14 days of discovering or being notified of the breach. 9 V.S. § 2435(b)(3)(B)(i). Notices to consumers must be sent within 45 days of discovering or being notified of the breach. 9 V.S. § 2435(b)(1).

40.     Credit Sesame therefore likely became aware of the data breach in early April, 2025.

41.     Per the Sample Notice that Credit Sesame provided to the Vermont government, Credit Sesame's investigation of the data breach revealed that "there may have been suspicious log-in activity for a limited period of time . . . which may have resulted in certain user account information being visible to the unauthorized actor."[15]

42.     This means that unknown cybercriminals had access to an unclear set of data—which is likely to include the PI of any or all of Credit Sesame's 18 million users, including Plaintiff—for an unknown period of time. And given that the cybercriminals were sufficiently sophisticated to breach Credit Sesame's security and access sensitive consumer PI, such data is likely to be sold on the Dark Web. After all, "[c]ybercriminals routinely harvest sensitive

---

[15] Sample Notice.

information through data breaches, phishing scams, and malware attacks, then sell this stolen data on Dark Web marketplaces to the highest bidder."[16]

43.    To Plaintiff's knowledge, Credit Sesame has yet to send notice of the breach to any consumer.

44.    Put differently, Credit Sesame has failed to provide timely, accurate and adequate notice of the data breach to Plaintiff and Class Members. Plaintiff and Class Members still do not know what PI Defendant lost in is now the possession of unknown third parties due to Defendant's unreasonable delay in notifying impacted consumers, including Plaintiff.

45.    For this reason, Plaintiff's and Class Members' stolen PI is likely to have already been published—or will be published imminently—by cybercriminals on the Dark Web.

46.    Credit Sesame has done little to rectify this harm. In the Sample Notice, Defendant offers two years of credit monitoring and identity related services, but, to Plaintiff's knowledge, no consumer has actually received a letter notifying them that their data was accessed and stolen, and offering such credit monitoring services. Even if they had, such an offer is woefully insufficient for multiple reasons.

47.    First, credit monitoring cannot unring the bell. Plaintiff and Class Members have had their most sensitive data—including financial data and SSNs—stolen and likely disseminated on the Dark Web. Mere credit monitoring will not protect their identities.

48.    Second, Credit Sesame *already* offers credit monitoring services to its users—users who now know that they cannot trust Credit Sesame to safely and securely maintain their data in the first place.

**PLAINTIFF'S EXPERIENCES**

49.    Plaintiff Christopher Miller is a resident of Long Beach, California.

50.    Plaintiff Miller has used Credit Sesame to monitor and build his credit since approximately 2020.

---

[16] https://preyproject.com/blog/dark-web-cyber-threats#:~:text=Cybercriminals%20are%20among%20the%20most,track%20transactions%20and%20apprehend%20perpetrators, *last accessed* May 1, 2025.

51.    As a condition of receiving services with Defendant, Plaintiff and Class Members provided Defendant with their PI. Defendant used that PI to facilitate its provision of services.

52.    Plaintiff only provided his PI to Credit Sesame because he believed that it would use reasonable measures to protect and safeguard his PI, in accordance with the Credit Sesame policies and applicable state and federal law.

53.    Plaintiff's belief was reasonable and was based upon advertisements and statements made by Credit Sesame.

54.    Credit Sesame failed to protect Plaintiff's and Class Members' PI.

55.    Plaintiff has already and will continue to expend considerable time, energy, and resources to protecting his sensitive PI.

56.    Plaintiff has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from his PI being exposed to cybercriminals. Indeed, since the Data Breach, Plaintiff has noticed an uptick of spam calls since the Data Breach in early April.

57.    Moreover, Plaintiff suffered actual injury in the form of damages to and diminution in the value of his PI. After all, PI is a form of intangible property—property that Defendant was entrusted to adequately protect.

58.    Plaintiff has a continuing interest in ensuring that his PI, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

## CLASS ACTION ALLEGATIONS

59.    Plaintiff Miller seeks to represent a class defined as all persons in the United States whose PI was compromised or exposed as a result of the Data Breach.

60.    Excluded from the Class is (i) Defendant, any entity in which a Defendant has a controlling interest or which has a controlling interest in Defendant, and Defendant's legal representatives, predecessors, successors and assigns; (ii) governmental entities; (iii) Defendant's employees, officers, directors, agents, and representatives and their family members; and (iv) the Judge and staff to whom this case is assigned, and any member of the judge's immediate family.

61.     Class-wide adjudication of Plaintiff's claims is appropriate because Plaintiff can prove the elements of his claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions asserting the same claims.

62.     *Numerosity*: The Class Members are so numerous that joinder of individual claims is impracticable. Although the precise number of impacted consumers is not yet known to Plaintiff, Plaintiff reasonably approximate that the number of Class Members is in the hundreds of thousands or potentially millions. The Class Members can be readily identified through Defendant's records.

63.     *Commonality*: There are significant questions of fact and law common to the Class Members. These issues include but are not limited to:

a.      Whether Defendant owed a duty or duties to Plaintiff and Class Members to exercise due care in collecting, storing, safeguarding, and obtaining their PI;

b.      Whether Defendant breached that duty or those duties;

c.      Whether Defendant failed to establish appropriate administrative, technical, and physical safeguards to ensure the security and confidentiality of records to protect against known and anticipated threats to security;

d.      Whether the security provided by Defendant was satisfactory to protect customer information as compared to industry standards;

e.      Whether Defendant misrepresented or failed to provide adequate information to customers regarding the type of security practices used;

f.      Whether Defendant knew or should have known that it did not employ reasonable measures to keep Plaintiff's and Class Members' PI secure and prevent loss or misuse of that PI;

g.      Whether Defendant acted negligently in connection with the monitoring and protecting of Plaintiff's and Class Members' PI;

h.      Whether Defendant's conduct was intentional, willful, or negligent;

i.      Whether Defendant violated any and all statutes and/or common law listed herein;

j.      Whether Classes Members suffered damages as a result of Defendant's conduct, omissions, or misrepresentations; and

k.      Whether Class Members are entitled to injunctive, declarative, and monetary relief as a result of Defendant's conduct.

64.     *Typicality*: Plaintiff's claims are typical of the claims of the Class. Plaintiff and all Class Members have been adversely affected and damaged in that Defendant failed to adequately protect their PI to the detriment of Plaintiff and the Class.

65.     *Adequacy of Representation*: Plaintiff will fairly and adequately represent the Class because he has the Class Members' best interests in mind, their individual claims are co- extensive with those of the Class, and he is represented by qualified counsel experienced in class action litigation of this nature.

66.     *Superiority*: A class action is superior to other available methods for the fair and efficient adjudication of these claims because individual joinder of the claims of all Class Members is impracticable. Many Class Members are without the financial resources necessary to pursue this matter. Even if some Class Members could afford to litigate their claims separately, such a result would be unduly burdensome to the courts in which the individualized cases would proceed. Individual litigation increases the time and expense of resolving a common dispute concerning Defendant's actions toward an entire group of individuals. Class action procedures allow for far fewer management difficulties in matters of this type and provide the unique benefits of unitary adjudication, economies of scale, and comprehensive supervision over the entire controversy by a single judge in a single court.

67.     The Class may be certified pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure because Defendant has acted on grounds generally applicable to the Class, thereby making final injunctive relief and corresponding declaratory relief appropriate with respect to the claims raised by the Class.

68.     The Class may also be certified pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure because questions of law and fact common to Class Members will predominate

over questions affecting individual members, and a class action is superior to other methods for fairly and efficiently adjudicating the controversy and causes of action described in this Complaint.

69.    Particular issues under Rule 23(c)(4) are appropriate for certification because such claims present particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein.

**CLAIMS FOR RELIEF**

**<u>COUNT I</u>**
**Breach of Contract**

70.    Plaintiff realleges each and every allegation above and incorporates by reference all other paragraphs of this Complaint as if fully set forth herein.

71.    Plaintiff and Class members entered into a contract with Defendant Credit Sesame when they joined Credit Sesame. In order to use Credit Sesame's services Plaintiff and Class members were forced to provide their PI, which Credit Sesame agreed to receive, store, utilize, transfer, and protect.

72.    Credit Sesame received a benefit when it received Plaintiff and Class members' PI.

73.    Plaintiff and Class members would not have provided their PI to Credit Sesame if they knew Credit Sesame would not safeguard their PI as promised.

74.    Credit Sesame violated the contracts when it failed to employ reasonable and adequate privacy practices and measures, which led to the disclosure of Plaintiff's and Class members' PI for purposes not required or permitted under the contracts or the law.

75.    Plaintiff and Class members are damaged by Credit Sesame's conduct, and will incur harms and injuries arising from the Data Breach now and in the future.

**<u>COUNT II</u>**
**Breach of Implied Contract**

76.    Plaintiff realleges each and every allegation above and incorporates by reference all other paragraphs of this Complaint as if fully set forth herein.

77.    When Plaintiff and Class members provided their PI to Defendant, they entered into implied contracts, in which Defendant agreed to protect their PI.

78.    Defendant solicited consumers, including Plaintiff and Class members, to use its services.

79.    An implied term of Defendant's offer was that Defendant would, by reasonable or industry-standard means, safeguard PI.

80.    Plaintiff and Class members accepted Defendant's offer when they provided PI to Defendant in order to utilize Defendant's services.

81.    Plaintiff and Class members would not have provided their PI to Defendant if they knew Defendant would not safeguard their PI as agreed.

82.    Defendant violated the contracts by failing to use reasonable and adequate privacy practices and measures, leading to the disclosure of Plaintiff's and Class members' PI for purposes not required or permitted under the contracts.

83.    Plaintiff and Class members have been injured by Defendant's conduct, incurring the harms and injuries arising from the Data Breach now and in the future.

<u>**COUNT III**</u>
**Breach of the Implied Covenant of Good Faith and Fair Dealing**

84.    Plaintiff realleges each and every allegation above and incorporates by reference all other paragraphs of this Complaint as if fully set forth herein.

85.    Plaintiff and Class Members maintained an implied contract with Credit Sesame when they provided their PI.

86.    Inherent in every contract is that implied covenant of good faith and fair dealing, which Defendant violated when they failed to maintain reasonable data security protocols, leading to the disclosure of Plaintiff's and Class members' PI for purposes not required or permitted under the contracts.

87.    Plaintiff and Class members have been injured by Defendant conduct, incurring the harms and injuries arising from the Data Breach now and in the future and are entitled to the losses and damages they have sustained as a direct and proximate result thereof, as well as their costs and attorneys' fees incurred in this action.

1
2

**COUNT IV**
**Negligence**

3    88.    Plaintiff realleges each and every allegation above and incorporates by reference all

4    other paragraphs of this Complaint as if fully set forth herein.

5    89.    Plaintiff and Class members entrusted Defendant with their PI, which is highly

6    sensitive and valuable data subject to confidentiality.

7    90.    Obtaining and storing Plaintiff's and Class members' PI, created a duty of

8    reasonable care that Defendant must take in safeguarding this PI.

9    91.    Defendant's networks, systems, protocols, policies, procedures and practices were

10   not adequately designed, implemented, maintained, monitored and tested to ensure that Plaintiff's

11   and Class members' PI was secured from release, disclosure, and/or publication.

12   92.    Defendant's networks, systems, protocols, policies, procedures and practices were

13   not reasonable given the sensitivity of the Plaintiff's and Class member's PI.

14   93.    Upon discovery of the breach, Defendant should have immediately reported the

15   Data Breach to Plaintiff and Class members, credit reporting agencies, the Internal Revenue

16   Service, financial institutions, and all other third parties might have a right to know and the ability

17   to mitigate harm to Plaintiff and Class members.

18   94.    Despite knowing their networks, systems, protocols, policies, procedures and

19   practices were not adequately designed, implemented, maintained, monitored and tested to ensure

20   that Plaintiff's and Class members' PI were secured from release, disclosure, and publication,

21   Defendant ignored the inadequacies and the risk of release, disclosure, and publication it

22   had created.

23   95.    Defendant's behavior illustrates a reckless disregard for Plaintiff's and Class

24   members' rights. Defendant's negligence is directly linked to Plaintiff's and Class

25   members' injuries.

26   96.    As a result of Defendant's reckless disregard for Plaintiff's and Class members'

27   rights, failing to secure their PI despite knowing their networks, systems, protocols, policies,

28   procedures, and practices were not adequately designed, implemented, maintained, monitored, and

tested, Plaintiff and Class members suffered injury. This injury includes but is not limited to the impermissible release, disclosure, and publication their PI as well as exposure to a heightened, imminent risk of fraud, identity theft, financial and other harm. Indeed, Plaintiff has himself actually suffered such harm already. This is all directly and indirectly caused by Defendant's negligence.

97.    Plaintiff and Class members must now monitor their financial accounts and credit histories more closely and frequently and have incurred and will continue to incur costs for the time and expense necessary to obtain credit reports, credit freezes, credit monitoring services, and other protective measures to deter or detect identity theft. The prohibited release, disclosure, and publication of Plaintiff's and Class members' PI has also diminished the value of their PI.

98.    The harm to Plaintiff and the Class members was a proximate and reasonably foreseeable result of Defendant's breaches of its duties of reasonable care in safeguarding Class members' PI.

99.    Plaintiff and Class members are entitled to damages in an amount to be proven at trial.

### COUNT V
### Negligence *Per Se*

100.    Plaintiff realleges each and every allegation above and incorporates by reference all other paragraphs of this Complaint as if fully set forth herein.

101.    Section 5 of the FTC Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses of failing to use reasonable measures to protect data collected on consumers.

102.    Defendant violated Section 5 of the FTC Act when it failed to use reasonable measures to protect PI and comply with applicable industry standards.  Defendant's conduct is particularly unreasonable given the nature and amount of PI they obtained and stored, as well as the foreseeable consequences of a data breach, including the immense damages that would result to Plaintiff and Class members.

103.    Defendant's violation of Section 5 of the FTC Act constitutes negligence per se.

104.    Plaintiff and the other Class members are within the class of persons that the FTC Act was intended to protect.

105.    The harm that occurred as a result of the Data Breach is the type of harm that the FTC Act was intended to protect against. Previously the FTC pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable security measures and avoid unfair or deceptive practices, caused similar harm to the harm suffered by Plaintiff and Class members as a result of the Data Breach.

106.    This injury and harm suffered by Plaintiff and Class members was the direct and proximate result of Defendant's violations of the FTC Act and similar state statutes. Plaintiff and Class members have suffered actual damages, including identity theft, improper disclosure of their PI, lost value of their PI, lost time and money incurred to mitigate and remediate the effects of the Data Breach, and increased risk of identity theft that continues to injure them in the future.

## COUNT VI
### Breach of Confidence

107.    Plaintiff realleges each and every allegation above and incorporates by reference all other paragraphs of this Complaint as if fully set forth herein.

108.    As alleged above, Plaintiff and Class members had agreements with Defendant, both express and implied, that required Defendant to keep their PI confidential.

109.    Defendant breached that confidence by disclosing Plaintiff's and Class members' PI without their authorization and for unnecessary purposes.

110.    As a result of the Data Breach, Plaintiff and Class members suffered damages that were attributable to Defendant's failure to maintain confidence in their PI.

## COUNT VII
### Unjust Enrichment

111.    Plaintiff realleges each and every allegation above and incorporates by reference all other paragraphs of this Complaint as if fully set forth herein.

112.    Plaintiff and Class members granted monetary benefits to Defendant when they provided Defendant with their PI. Plaintiff and Class members understood, that in doing so, part of

the benefits Defendant derived from the PI would be applied to data security efforts to safeguard the PI.

113.    Defendant was enriched when it saved costs they reasonably should have expended on data security measures to securely maintain Plaintiff's and Class members' PI.

114.    Defendant did not provide the reasonable level of security that would have prevented the Data Breach, and instead avoided its data security obligations at the expense of Plaintiff and Class members by utilizing cheaper, ineffective security measures. Plaintiff and Class members, on the other hand, suffered as a direct and proximate result of Defendant's failure to provide the requisite security.

115.    It would be inequitable to allow Defendant to keep hold of the monetary value of the benefit provided by Plaintiff and Class members to Defendant at the cost of their PI security, since Defendant failed to implement appropriate data management and security measures that are mandated by industry standards.

116.    Defendant acquired monetary benefits and PI through inequitable means when it failed to disclose its inadequate security practices previously alleged.

117.    If Plaintiff and Class members knew Defendant had not properly secured their PI, they would not have agreed to provide their PI to Defendant.

118.    Plaintiff and Class members have no adequate remedy at law.

119.    As a direct and proximate result of Defendant's conduct, Plaintiff and Class members have suffered and will suffer injury, included but not limited to: (i) identity theft; (ii) loss of opportunity to control how their PI is used; (iii) the compromise, publication, and/or theft of their PI; (iv) out-of-pocket expenses associated with the prevention, detection, recovery from identity theft, and/or unauthorized use of their PI; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (vi) continued risk to their PI, which remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fail to undertake appropriate and adequate measures to protect PI in their continued possession and

(vii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the PI compromised as a result of the Data Breach for the remainder of the lives of Plaintiff and Class members.

120.    As a direct and proximate result of Defendant's conduct, Plaintiff and Class members have suffered and will continue to suffer other forms of injury and/or harm.

121.    Defendant should be compelled to place proceeds that it unjustly received from Plaintiff and Class members into a common fund or constructive trust for their benefit.

**<u>COUNT VIII</u>**
**Negligent Misrepresentation**

122.    Plaintiff realleges each and every allegation above and incorporates by reference all other paragraphs of this Complaint as if fully set forth herein.

123.    As discussed herein, Defendant touted its cybersecurity, advertising its "[s]ecurity you can trust" and assuring consumers that it treats consumer data "as if it were our own." Further, Credit Sesame stated plainly: "Your data is always secure[.]" Not so. Defendant failed to disclose that its networks, systems, protocols, policies, procedures and practices were not adequately designed, implemented, maintained, monitored and tested to ensure that Plaintiff's and Class Members' PI were secured from release, disclosure, and publication.

124.    At the time Defendant made these representations, Defendant knew or should have known that these representations were false or made them without knowledge of their truth or veracity.

125.    At an absolute minimum, Defendant negligently misrepresented material facts about the safety and cybersecurity of its services.

126.    The negligent misrepresentations made by Defendant, upon which plaintiffs and the Class reasonably and justifiably relied, were intended to induce and actually induced Plaintiff and the Class to use Credit Sesame's services and to entrust Credit Sesame with their PI.

127.    The negligent actions of Defendant caused damage to Plaintiff and the Class, who are entitled to damages and other legal and equitable relief as a result.

1

**COUNT IX**
**Violation of the California Consumer Privacy Act**
**Cal. Civ. Code §§ 1798.100 *et seq.* ("CCPA")**

2

3    128.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully

4    set forth herein.

5    129.    The CCPA states that a "business that collects a consumer's personal information

6    shall implement reasonable security procedures and practices appropriate to the nature of the

7    personal information to protect the personal information from unauthorized or illegal access,

8    destruction, use, modification, or disclosure in accordance with Section 1798.81.5." Cal. Civ. Code

9    § 1798.100(e).

10    130.    Section 1798.150(a)(1) of the CCPA provides: "Any consumer whose nonencrypted

11    or nonredacted personal information, as defined [by the CCPA] . . . is subject to an unauthorized

12    access and exfiltration, theft, or disclosure as a result of the business' violation of the duty to

13    implement and maintain reasonable security procedures and practices appropriate to the nature of

14    the information to protect the personal information may institute a civil action for" statutory or

15    actual damages, injunctive or declaratory relief, and any other relief the court deems proper.

16    131.    The CCPA defines "personal information" to include an individual's name in

17    combination with email address, account name, SSN, or "other similar identifiers." *Id.*

18    at § 1798.140(v)(1).

19    132.    The CCPA defines "sensitive personal information" to include SSNs. *Id.*

20    at § 1798.140(ae).

21    133.    Plaintiff is a "consumer" as defined by Cal. Civ. Code § 1798.140(i) because he is

22    a "natural person who is a California resident, as defined in Section 17014 of Title 18 of the

23    California Code of Regulations."

24    134.    Defendant is a "business" as defined by Cal. Civ. Code § 1798.140(d)(1)(A)

25    because, *inter alia*, it "had annual gross revenues in excess of twenty-five million dollars

26    ($25,000,000) in the preceding calendar year."

27    135.    Plaintiff's PI was subject to unauthorized access and exfiltration, theft, or disclosure

28    because of Defendant's inadequate security measures.

136.   The Data breach occurred as a result of Credit Sesame's failure to implement and maintain reasonable security procedures and practices appropriate to the nature of the information it collected and stored. Defendant failed to implement reasonable security procedures to prevent unauthorized access of Plaintiff's PI as a result of a cyberattack.

137.   Plaintiff will provide written notice to Defendant pursuant to Civil Code § 1798.150(b), identifying the specific provisions of the CCPA Plaintiff alleges Defendant has or is violating. Although a cure is not possible under the circumstances, if as expected Defendant is unable to cure or do not cure the violation within 30 days of receipt, Plaintiff will amend this complaint to pursue actual or statutory damages as permitted by Civil Code § 1798.150(a)(1)(A).

138.   Defendant's violation of this title was willful, intentional, or reckless.

139.   As a result of Defendant's failure to implement and maintain reasonable security procedures and practices that resulted in the Data Breach, Plaintiff seeks damages, injunctive and declaratory relief, and any other relief as deemed appropriate by the Court.

**COUNT X**
**Violation of the California Unfair Competition Law**
**Cal. Bus. & Prof. Code §§ 17200 *et seq.* ("UCL")**

140.   Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

141.   The UCL prohibits any "unlawful," "fraudulent," or "unfair" business act or practice and any false or misleading advertising, as those terms are defined by the UCL and relevant case law. By virtue of the above-described wrongful actions, inaction, omissions, and want of ordinary care that directly and proximately caused the Data Breach, Defendant engaged in unlawful, unfair and fraudulent practices within the meaning, and in violation of, the UCL.

142.   In the course of conducting its business, Credit Sesame committed "unlawful" business practices by, *inter alia*, knowingly failing to design, adopt, implement, control, direct, oversee, manage, monitor and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems to safeguard and protect Plaintiff's and Class members' PI, and by violating the statutory and common law alleged herein, including, *inter alia*, the CCPA, Section 5 of the FTCA, the CGIPA, and Article I, Section 1 of the California

Constitution (California's constitutional right to privacy). Plaintiff and Class members reserve the right to allege other violations of law by Defendant constituting other unlawful business acts or practices. Defendant's above-described wrongful actions, inaction, omissions, and want of ordinary care are ongoing and continue to this date.

143.    Defendant's above-described wrongful actions, inaction, omissions, want of ordinary care, misrepresentations, practices, and non-disclosures also constitute "unfair" business acts and practices in violation of the UCL in that Defendant's wrongful conduct is substantially injurious to consumers, offends legislatively-declared public policy, and is immoral, unethical, oppressive, and unscrupulous. Defendant's practices are also contrary to legislatively declared and public policies that seek to protect PI and ensure that entities who solicit or are entrusted with personal data utilize appropriate security measures, as reflected by laws such as the CCPA, Article I, Section 1 of the California Constitution (California's constitutional right to privacy), the CGIPA, and Section 5 of the FTCA. The gravity of Defendant's wrongful conduct outweighs any alleged benefits attributable to such conduct. There were reasonably available alternatives to further Defendant's legitimate business interests other than engaging in the above-described wrongful conduct.

144.    The UCL also prohibits any "fraudulent business act or practice." Defendant's nondisclosures and misrepresentations regarding the security of Plaintiff's and Class members' PI and their inadequate data security were false, misleading, and likely to deceive the consuming public in violation of the UCL.

145.    The injury and harm that Plaintiff and Class members suffered was the direct and proximate result of Defendant's violations of the UCL. Plaintiff and Class members have suffered (and will continue to suffer) economic damages and other injury and actual harm in the form of, *inter alia*: (i) a substantially increased risk of identity theft—risk which justifies or necessitates expenditures for protective and remedial services, for which they are entitled to compensation; (ii) improper disclosure of their PI; (iii) breach of the confidentiality of their PI; (iv) deprivation of the value of their PI, for which there is a well-established national and international market; (v) and

1    lost time and money incurred to mitigate and remediate the effects of the Data Breach, including

2    the increased risk of identity theft they face and will continue to face.

3        146.    Unless restrained and enjoined, Defendant will continue to engage in the above-

4    described wrongful conduct and more data breaches will occur. Plaintiff, therefore, on behalf of

5    themselves, Class members, and the general public, also seek restitution and an injunction

6    prohibiting Defendant from continuing such wrongful conduct, and requiring Defendant to modify

7    its corporate culture and design, adopt, implement, control, direct, oversee, manage, monitor and

8    audit appropriate data security processes, controls, policies, procedures protocols, and software and

9    hardware systems to safeguard and protect the PI entrusted to it, as well as all other relief the Court

10   deems appropriate, consistent with Bus. & Prof. Code § 17203.

11                                **COUNT XI**
                      **Violation of California False Advertising Law**
12                     **Cal. Bus. & Prof. Code §§ 17500, *et seq.***

13       147.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth

14   above as though fully set forth herein.

15       148.    Each of the deceptive and misleading advertising practices of Defendant set forth

16   above constitutes untrue or misleading advertising under the California False Advertising Law

17   ("FAL"), California Business & Professions Code section 17500, *et seq.*

18       149.    At all material times, Defendant's statements and marketing and advertising

19   materials misrepresented or omitted material facts regarding the safety of the PI Plaintiff and Class

20   Members entrusted to Defendant, as set forth in this Complaint. Defendant is disseminating

21   statements, marketing and advertising concerning the cybersecurity consumer data in its possession

22   that are unfair, untrue, deceptive, or misleading within the meaning of California Business &

23   Professions Code section 17500, *et seq.* Defendant's acts and practices have deceived and/or are

24   likely to continue to deceive Plaintiff, members of the Class, and the public. As set forth above,

25   Defendant's cybersecurity claims are deceptive and misleading to reasonable consumers because

26   Defendant's cybersecurity fails to meet average standards of safety, as shown by the Data Breach.

27   Moreover, Defendant intentionally does not disclose any of this information to consumers and

28   instead represents to consumers that, *inter alia*, "[y]our data is always secure."

150.    In making and disseminating the statements alleged herein, Defendant knew or should have known its advertisements were deceptive and misleading. Plaintiff and members of the Class based their decisions to use Credit Sesame's services on Defendant's misrepresentations and omissions of material facts.

151.    Plaintiff and Class members are entitled to relief, including enjoining Defendant to cease and desist from engaging in the practices described herein, as well as a declaration of rights that Defendant's safety claims are deceptive and misleading.

## COUNT XII
### Declaratory Judgment

152.    Plaintiff realleges each and every allegation above and incorporates by reference all other paragraphs of this Complaint as if fully set forth herein.

153.    Defendant failed to fulfill its obligations to provide adequate and reasonable data security measures for the PI of Plaintiff and the Class, as evidenced by the Data Breach.

154.    As a result of the Data Breach, Defendant's systems are more vulnerable to access by unauthorized parties and require more stringent measures to be taken to safeguard the Plaintiff's and Class members' PI going forward.

155.    An actual controversy has arisen in the wake of the Data Breach regarding Defendant's current obligations to provide data security measures that will adequately protect Plaintiff's and Class members' PI.

156.    Plaintiff seeks a declaration that Defendant must implement specific additional, prudent, industry-standard data security practices to provide reasonable protection and security to Plaintiff's and Class members' PI. Specifically, Plaintiff and the Class seek a declaration that Defendant's existing security measures do not comply with their obligations, and that Defendant must implement and maintain reasonable data security measures on behalf of Plaintiff and the Class to comply with its data security obligations.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment on behalf of himself and members of the Class as follows:

A.     For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff Miller as representative of the Class;

B.     Awarding monetary and actual damages and/or restitution, as appropriate;;

C.     Awarding punitive damages, as appropriate;

D.     Awarding declaratory and injunctive relief as permitted by law or equity to ensure that the Class has an effective remedy, including enjoining Defendant from continuing its unlawful practices;

E.     Prejudgment interest to the extent allowed by the law;

F.     Awarding all costs, including expert fees and attorneys' fees, expenses, and costs of prosecuting this action; and

G.     Such other and further relief as the Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury on all causes of action or issues so triable.

Respectfully submitted,

**KAPLAN FOX & KILSHEIMER LLP**

DATED:  May 2, 2025                    By:  /s/ *Laurence D. King*
                                                    Laurence D. King

Laurence D. King (SBN 206423)
Matthew B. George (SBN 239322)
Clarissa R. Olivares (SBN 343455)
1999 Harrison Street, Suite 1560
Oakland, CA 94612
Telephone: (415) 772-4700
Facsimile:  (415) 772-4707
Email: *lking@kaplanfox.com*
          *mgeorge@kaplanfox.com*
          *colivares@kaplanfox.com*

*Counsel for Plaintiff Christopher Miller and the Proposed Class*